IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Ahmed "Doe", et al | ) |
| Petitioners, | ) |
| v. | ) Civil Action No. 05-CV-1458 (ESH) |
| GEORGE W. BUSH, President of the United States, *et al.*, | ) |
| Respondents. | ) |

**PETITIONER'S MEMORANDUM SHOWING CAUSE WHY PETITION FOR WRIT OF HABEAS CORPUS SHOULD NOT BE DISMISSED FOR LACK OF "NEXT FRIEND" STANDING**

1

## STATEMENT OF FACTS

Petitioner, Ahmed Doe, is in the custody under or by the color of authority of the United States at Guantanamo Naval Base on the island of Cuba and has been so held for an indeterminate amount of time. He has not been charged with a crime nor appeared before a civilian court of law. On June 28, 2004, the Supreme Court held, in *Rasul v. Bush*, ___ U.S. ___, 124 S. Ct 2686, that those in custody at Guantanamo are entitled to *Habeas Corpus* review by United States District Courts. On August 10, 2005, Ahmed Doe, through his "Next Friend", Omar Deghayes, filed a Writ of Habeas Corpus in this Court. On August 31, 2005, Respondents moved for an Order to Show Cause why the Petition should not be dismissed and on October 11, this Court issued a Memorandum Order directing Petitioner to Show Cause why this case should not be dismissed for lack of proper "Next Friend" standing.

## ARGUMENT

I.  The Special Circumstances Under Which Petitioner Labors, All Imposed by Respondents, Severely Incapacitate Petitioner's Access to This Court and Renders the Relationship Between Petitioner and His "Next Friend" Unique

Petitioner has been detained and imprisoned by Respondents at the U.S. Naval Base at Guantanamo, Cuba, for an undetermined time, possibly as long as 3½ years. He has been held incommunicado, in virtual isolation from external friends and family, as Respondents have refused to divulge the names of the Guantanamo detainees, their countries of origin, or the names of their relatives. (See Olshansky Declaration ¶¶ 5, 8, 9, Attached to Petitioner's Opposition to Respondents' Motion for an Order to Show Cause "Exhibit B"). Until commanded otherwise by the United States Supreme Court in

*Rasul v. Bush*, \_\_\_\_ U.S. \_\_\_\_, 124 S.Ct. 2686 (2004), Respondents refused to provide Petitioner with counsel, refused to permit him to seek judicial relief on his own behalf, and refused him access to courts even via "next friend" standing. Now that some Guantanamo detainees, including Petitioner, Ahmed Doe, seek standing in United States District Court, via "next friend" status subsequent to the decision in *Rasul*, Respondents are attacking the validity of even this time honored method of access to judicial review. The attack might have merit were Petitioner Ahmed Doe held under normal circumstances so that he could obtain, or attempt to obtain, external assistance in petitioning this Court. But the circumstances to which he is subject are nowhere near "normal." For example:

> He is a resident of Libya;
>
> He has been allowed virtually no contact with the news media or any word from outside the closed Guantanamo prison system for the length of his imprisonment;
>
> He has been allowed no contact with his friends or family members;
>
> He is unfamiliar with the United States Court System and likely does not know what the term *Habeas Corpus* means.
>
> He has had no criminal charges brought against him;
>
> He has every reason to rely on his friendships with other prisoners who speak his language and suffer under the same disabilities;
>
> Like most Guantanamo prisoners, Petitioner's family members are unknown to outsiders, and in almost all cases unreachable by prisoners themselves, making it necessary for him to rely on fellow inmates for access to courts (See Olshansky Declaration, ¶ 5; See also Smith Declaration, ¶¶ 47-77, Attached as "Exhibit A" to Petitioner's Opposition to Respondents' Motion for an Order to Show Cause).

>No party outside Guantanamo is allowed to be aware of the specific camp or building in which Petitioner is being imprisoned, nor the "grade" or "level" of penal detention he occupies, each level being determinative of the privileges he receives. It cannot be know, therefore if Petitioner has access to paper, pen or pencil.
>
>He does not have access to a law library;
>
>He cannot communicate with his attorney, nor does he even know at present that he has an attorney;
>
>He has no expectation of release, ever; and
>
>He has every reason to challenge his confinement.

For Respondents to argue that under these circumstances Petitioner Ahmed Doe cannot lawfully challenge the legality of his confinement because his "next friend" may not qualify under *Whitmore* guidelines, is irrational at best and more likely disingenuous. It is disingenuous because the very disabilities which prevent Petitioner from contacting external friends and family are imposed by Respondents themselves. Even the dissenters imprisoned in the Tower of London in the 17th century, for whom the *Habeas* Petition became their only remaining thread of British Law, had less severe conditions of isolation than those occasioning Petitioner Ahmed Doe herein.

An additional circumstance, also imposed at the insistence of Respondents, makes Petitioner's access to the Courts even more problematic. Petitioner's counsel cannot interview Ahmed Doe in person until he has received security clearance which has not yet been attained. (See Boris Declaration, ¶ 6, attached hereto as "Exhibit A"). While he recently was interviewed by the FBI, which is conducting its investigation, as long as clearance has not been granted he cannot visit Petitioner to obtain his own consent (or non-consent) to proceed on his behalf. Had Respondents not requested this unique

4

qualification for attorneys to gain access to their clients or potential clients, the matter under review today could have been resolved before the Petition was filed or shortly thereafter, as Petitioner could have indicated his desire (or lack of desire) for representation to the undersigned in person.

II.     The *Whitmore* Standards are Circumstantially Inapplicable to Petitioner Herein

Respondents argue that in *Whitmore v. Arkansas*, 495 U.S. 149 (1990), the Supreme Court set established standards for "next friend" standing which are not fulfilled in the case under review today.

To appreciate these standards adequately, it is necessary to review briefly the facts of that case. The real party in interest in *Whitmore* was named Simmons, an extremely aware if not legally sophisticated Defendant. Simmons was tried, with assistance of counsel, for two of sixteen murders with which he was charged. Subsequent to his conviction and sentence of death, Simmons swore an oath that he wanted no appeal. The trial court conducted a hearing concerning his competence to waive further proceedings and found his decision was knowing and intelligent. As his execution date approached, a priest who counseled inmates petitioned the Arkansas Supreme Court, as Simmons' "next friend," to prosecute the very appeal Simmons did not wish to have pursued. The priest did not indicate that he had ever met Simmons and claimed standing as an "aggrieved taxpayer" and "concerned citizen." His standing was denied. The priest tried once again, this time jointly with another death row inmate, and was denied standing a second time.

Simmons then underwent a second trial, again with the assistance of counsel, for the remaining fourteen murders, found guilty, and again sentenced to death. He again notified the Court of his desire to waive appeal and after another hearing was again found competent to do so. The tribunal considering his competency noted that Simmons had been notified by his attorney of several points of possible reversal upon appeal and that they were all rejected by the condemned man. Three days later another death row inmate, named Whitmore, sought permission to intervene on Simmons' behalf as a "next friend" but was denied standing. Whitmore appealed to the Supreme Court, pursuing the "next friend" issue (among others) and the *Whitmore* decision bears his name.

The Supreme Court acknowledged that it had not previously discussed the concept of "next friend" standing at length, but noted it had long been an accepted basis for jurisdiction "most frequently (when) 'next friends' appear in court on behalf of detained prisoners who are unable, usually because of mental incompetence or *inaccessibility*, to seek relief themselves" (495 U.S. 149, 161-162, emphasis added, citations omitted).

The *Whitmore* decision then set forth a summary of the "next friend" standards to which lower courts have generally adhered. Such standing is not to be considered automatically granted, the Court ruled. Rather (at 163-164):

> (d)ecisions applying the habeas corpus statute have adhered
> to at least two firmly rooted prerequisites for "next friend"
> standing. First a "next friend" must provide an adequate
> explanation – such as inaccessibility, mental incompetence,
> or other disability – why the real party in interest cannot
> appear on his own behalf to prosecute the action (citations
> omitted). Second, the "next friend" must be truly dedicated
> to the best interests of the person on whose behalf he seeks to

6

> litigate (citation omitted), and it has been suggested that a "next friend" must have some significant relationship with the real party in interest (citation omitted).

[The omitted citations for the first and second standard refer to cases from the 7th and 8th Circuit Courts of Appeal, a Virginia District Court, and the State of California; the "suggestion" comes from a Georgia District Court.]

The underlying philosophy for having such standards, Chief Justice Rehnquist, for the court, concluded, is "the recognition that 'it was not intended that the writ of habeas corpus should be availed of, as a matter of course, by intruders or uninvited meddlers, styling themselves 'next friends.' Indeed, if there were no restrictions on 'next friend' standing in federal courts, the litigant *asserting only a generalized interest in constitutional governance* could circumvent the jurisdictional limits of Article III simply by assuming the mantle of 'next friend'" (at 164, emphasis added).

The information available to the undersigned reveals that Petitioner Ahmed Doe and his "next friend" Omar Deghayes cannot fit precisely into the standards set forth in *Whitmore* because of the oppressive circumstances set forth in Argument I, *infra*. These circumstances, created in whole by Respondents and exacerbated by both Ahmed Doe and Omar Deghayes's lack of legal knowledge and Ahmed Doe's lack of access to other legal redress, were not even remotely similar to those which determined the status of Whitmore and Simmons themselves.

The principle theory of *Whitmore*, which underlies the two-pronged test, is that the "next friend" mechanism is meant to provide access to courts for those who are unable, because of inaccessibility, to seek relief themselves. This is stated twice, in

7

Rehnquist's general introduction to the "next friend" concept, quoted herein above, and in his first of the two prong test to be satisfied for "next friend" standing. It finds its way into the first prong as a requirement that the "next friend" explain why the party in interest suffers from inaccessibility.

It is submitted that as *inaccessibility* is Petitioner Ahmed Doe's primary circumstance, it is also his primary argument. He lacks access to the courts to seek relief on his own behalf because of the conditions under which he (and his "next friend") labor. To the degree that the first test places a burden upon Omar Deghayes to "provide an adequate explanation" of the circumstances of Ahmed Doe's inaccessibility, this too is obviated by the existence of circumstances which speak for themselves. Omar Deghayes does not know the members of Ahmed Doe's family nor his friends in Libya, nor can he reach them. He knows that he himself has obtained an attorney and that if his friend Ahmed Doe cannot obtain one he will continue to remain as inaccessible at Guantanamo as he has been for years.

The second *Whitmore* test, that Omar Deghayes demonstrate his dedication to Ahmed Doe's best interests, is equally as problematic in this case. It is simply unknown - - and will remain unknown - - what the depth or quality of their friendship is because of the inability to gain access to Ahmed Doe. On the other hand, some facts are known about Omar Deghayes and Ahmed Doe's relationship. Omar Deghayes' "next friend" authorization states that he knows that Ahmed Doe desires legal assistance. Omar Deghayes also provides the names of numerous other Guantanamo prisoners who have

desired legal representation. (See Authorization of Omar Deghayes, attached as Exhibit A to the Petition)

It can therefore hardly be said that "next friend" Omar Deghayes's interest in assisting Ahmed Doe constitutes "asserting only a generalized interest in constitutional governance." (See Rehnquist's fear articulated in *Whitmore* at 164, based upon the fact that Simmons had styled himself an "aggrieved taxpayer" and a "concerned citizen.") Omar Deghayes's letter states plainly "that he (Ahmed Doe) would want legal assistance to secure his freedom." (Exhibit A to the Petition). Omar Deghayes's interest is in obtaining the release of his fellow inmates.

Whitmore had a trial with counsel; two trials with counsel in fact. He had two further hearings at which independent tribunals determined that he was capable of knowingly waiving an appeal. Two separate individuals on two separate occasions sought "next friend" status not only without Simmons' consent or approval but *over his stated objection*. Whitmore was found, subsequent to being afforded due process of law, to be a mass murderer. All Petitioner Ahmed Doe seeks is to have his Petition brought before this Court, and Respondents well know that it if is not so presented, Petitioner will have no access to *any* civil court, ever.

There is no evidence that Omar Deghayes or Ahmed Doe are "intruders" (as was Whitmore) or uninvited (as was Whitmore) nor "meddlers," unless seeking to have one's lengthy incarceration without charge and without trial judicially reviewed for the first time can be considered as "meddlesome." It would strain credulity and human decency to think so.

9

One wonders, given Respondents' position in this matter, what recourse a Guantanamo prisoner may have if he has no family members to contact nor any friends in confinement with him who satisfy the degree of intimacy required by the *Whitmore* tests.

According to Clive Statford-Smith, who represents a number of Guantanamo prisoners as co-counsel for the Center for Constitutional Rights, and who has traveled extensively in the Mid-East seeking family members of the prisoners, to request that a family member be a "next friend" might put the said family member in danger in the foreign country of one's residence. (Exhibit "A" attached to Petitioner's Opposition to Motion for Order to Show Cause, ¶ 74.)

Surely the letter of "next friend" Omar Deghayes constitutes sufficient evidence of a *prima facie* right of Ahmed Doe to at least engage in two personal visits with the undersigned before Respondents' relief is granted.

The fact that the circumstances of both Ahmed Doe's and Omar Deghayes' confinement are unique is beyond dispute. It is indeed these special conditions which occasioned Judge Kollar-Kotelly to rule in (post-*Rasul*) *Al Odah v. United States*, 346 F.Supp. 2d 1, 8 (D.D.C. 2004) that Petitioners at Guantanamo have the right to assistance of counsel in pursuant to the federal *Habeas Corpus* statute. After noting their years of isolation and the circumstances of their capture, Judge Kollar-Kotelly wrote to say that they are "'seriously impaired' is an understatement…It is simply impossible to expect Petitioners to grapple with the complexities of a foreign legal system and present their claims to this Court without legal representation." While the

Court was speaking of legal representation itself, it is submitted that the circumstances occasioning the Judge's conclusion have not changed. They over-shadow everything in this case.

    III.    <u>Petitioner's Right to Invoke The Great Writ of Habeas Corpus, Whether Framed in Common Law, or Constitutional, or Statutory Terms, Transcends Procedural Formalities</u>

Long before our Constitution was adopted, the common law protected against executive detention imposed without due process, and *Habeas Corpus* existed as a means to enforce the common law right to due process. As Justice Scalia recently explained, common law protections against executive detentions, recognized by Blackstone in his *Commentaries* [Vol. I, 122-32 (1705)] and our Constitutional founders, were built upon two central ideas: "due process as the right secured, and habeas corpus as the instrument by which due process could be insisted upon." *Hamdi v. Rumsfeld*, 124 S.Ct. 2633, 2661 (2004) (Scalia, J., dissenting).

The original *habeas corpus* provision, found in 28 U.S.C. § 2241 (c)(1), entitles anyone held "in custody under or by color of the authority of the United States" to obtain judicial review of the legality of the detention. That provision derives not from the Constitution, but from the common law. *Rasul v. Bush*, ___ U.S. ___, 124 S.Ct. 2686 at 2691-92.

As the Supreme Court pointed out in *Rasul*, the statutory entitlement to judicial review of federal detentions is part of our common law heritage, "throwing its root deep into the genius of our common law." 124 S.Ct. at 2692. That provision was adopted in the first Judicial Act enacted by the First Congress in 1789 – prior to the adoption of the